# UNITED STATES DISTRICT COURT
### for the
Eastern District of Wisconsin

In the Matter of the Search of:

ZTE cell phone assigned phone number (414) 795-6500.
See Attachment E.

Case No. **18-MJ-1325**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

ZTE cell phone assigned phone number (414) 795-6500.
See Attachment E.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment F.

The basis for the search under Fed. R. Crim P. 41(c) is:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 18 U.S.C. § 922(g)(9).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_Mary B_
*Applicant's signature*

Special Agent Marcy Bohn, ATF
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: **10/23/18**

*Judge's signature*

City and State: Milwaukee, Wisconsin

William E. Duffin , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
## AND SEARCH WARRANTS

I, Marcy Bohn, being duly sworn, do hereby state the following:

## I.    BACKGROUND AND TRAINING

1.    I am a Special Agent ("SA") with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and have been so employed for approximately 11 years.

2.    As a Special Agent, I am a graduate of the ATF National Academy and Basic Criminal Investigator Course, where I received training in federal firearms laws and regulations. I regularly refer to these laws and regulations during the course of my duties. I have participated in the execution of numerous search and arrest warrants for violations of federal firearms laws. I have participated in undercover operations and surveillance of individuals committing crimes of violence, as well as prohibited persons in possession of firearms. I am currently assigned to the St. Paul Field Division, Milwaukee Group III, in the City of Milwaukee, WI.

## II.    PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of a criminal complaint and arrest warrant for Lonnie Ray MIXON Jr. ("MIXON") for violations of Title 18 U.S.C. § 922(g)(9), which prohibits any individual to possession a firearm who has been convicted in any court of a misdemeanor crime of domestic violence. This affidavit is also made in support of an application for a search warrant for a DNA sample from MIXON, which is further described below in Attachment A hereto.[1] This search warrant is to seize evidence of

---

[1] As detailed in paragraphs 6, one of the firearms recovered in this investigation has been swabbed for possible DNA.

1

violations of Title 18 U.S.C. § 922 (g) (9) and 1512, and Title 21 U.S.C. § 841 and 844.
This affidavit is also made in support of an application for a search warrant for MIXON's
vehicle ("Target Vehicle"), a silver 2006 Buick Lacrosse bearing WI plate number
ACB6404 that is further described below in Attachment C hereto, and to seize and search
MIXON's cell phone described as a ZTE cell phone with a silver rim. The carrier of the
phone is Metro PCS and the number is (414) 795-6500. This search warrant is to seize
evidence of violations of Title 18 U.S.C. § 922(g)(9) and 1512, and Title 21 U.S.C. §
841 and 844.

4.      This affidavit is intended to show that there is sufficient probable cause for the
requested arrest warrant and search warrants and does not purport to set forth all of my
knowledge of or investigation into this matter. The statements set forth in this affidavit
are based upon my training, education, experience as an ATF SA, consultation with
experienced law enforcement officers and agents, and other reliable sources of
information relative to this investigation.

## III.      PROBABLE CAUSE

5.      I have reviewed Milwaukee Police Department (MPD) reports regarding an
investigation of multiple gunshots being heard in the middle of the night in a residential
area in the City of Milwaukee. The gunshots occurred on April 13, 2018 and were shot at
a residence, located at 2333 N. Hubbard Street in the City of Milwaukee as well as other
residences and a car. Four bullets struck the residence. Responding offices located eight
.45 caliber casings and eighteen 9mm casings. These casing were recorded in the
National Integrated Ballistic Information Network ("NIBIN") by MPD.

6. As part of this investigation, I have learned that on June 4, 2018 MPD officers attempted to stop an individual who was later determined to be MIXON. As officers approached MIXON, they observed MIXON toss an object into the bushes. A Glock, Model 30GEN4, .45 caliber pistol bearing serial number BDGH119 ("Glock 30") was recovered from the location where MIXON tossed it in the bushes by MPD and MIXON was placed under arrest. The recovered firearm was swabbed in five places for possible DNA, but MIXON's DNA was not taken for a comparison sample. I know form my experience and training, that if DNA were collected from the defendant, it can still be compared to any possible DNA found on this Glock 30 at a later date. Obtaining a sample of MIXON's DNA would provide law enforcement with the ability to compare his DNA against the five swabs that were taken from the seized Glock 30 firearm.

7. The Glock 30 recovered on June 4, 2018 was traced back to the original purchaser, A.M. According to information I received, A.M. purchased the Glock 30 on March 27, 2018 from Mills Fleet Farm in Germantown, WI.

8. The National Integrated Ballistic Information Network ("NIBIN") was able to match eight .45 caliber casings recovered from the April 13, 2018 shooting to the Glock 30 recovered on June 4, 2018.

9. On June 28, 2018, law enforcement interviewed A.M. A.M. was asked if she was still in possession of the Glock 30 that she had purchased from Mills Fleet Farm on March 27, 2018 in the City of Germantown, WI. A.M. replied yes, then lead agents to the rear of the residence and into an unattached garage. In the garage was a vehicle and two couches. A.M. reached down inside both couch creases for approximately one to two minutes and then said that the Glock 30 was missing.

10. A.M. also informed agents that she had purchased another firearm as well. A.M. stated that she purchased a Glock 19 towards the end of April or early May from the same Mills Fleet Farm in Germantown, WI where she bought the Glock 30. A.M. informed agents that she did not buy any ammunition for either firearm.

11. I know from my investigation into this matter that a Glock Model 19 is a 9mm pistol and that there were eighteen (18) 9mm casings recovered on April 13, 2018. During the interview, A.M. told us that the Glock 19 was at her sister's residence and she tried to call her sister several times with no answer.

12. I then showed A.M. a black and white photo of MIXON and asked if she recognized the individual in that photo. A.M. replied that he was her "baby daddy" for all four of her children. I informed A.M. that MIXON had recently been was arrested for possession of the Glock 30 she had purchased.

13. I provided A.M. with a business card and asked A.M. to send a photo including the serial number of the firearm that A.M. claimed was at her sister's residence when her sister got home from work later that evening. A.M. stated that she would get back to me.

14. On June 29, 2018, SA Krzeptowski and I interviewed A.M. at her residence as she had contacted law enforcement to let them know that she had the firearm. Agents asked to view the Glock 19, 9mm caliber pistol bearing serial number BFAC980 ("Glock 19") that was purchased by A.M. from Mills Fleet Farm in Germantown, WI on April 6, 2018.

15. A.M. retrieved the GLOCK 19 from her purse and stated that she had just picked it up from her sister's house where she claimed it had been stored.

16. Agents informed A.M. that they wanted to seize the firearm for testing as part of their ongoing investigation and issued A.M. a consent to the search form. A.M. stated

4

that she understood her rights and signed the form giving agents authority to seize the firearm. Agents then left the residence with the seized Glock 19.

17.     Later, on that same date, the Glock 19 was taken for NIBIN testing at MPD. Forensic Ballistic Specialist Michael Perez test fired the firearm.

18.     Perez later notified me that the Glock 19 matched shell casings recovered from April 13, 2018. Therefore, both the Glock 30 and Glock 19 purchased by A.M. prior to April 13, 2018 were used in a shooting on April 13, 2018.

19.     Agents then met again with A.M. and informed her that the Glock 19 was tested and linked to the same April 13, 2018 shooting incident as the Glock 30 had been linked.

20.     A.M. stated that MIXON was the person for whom she bought both Glock 30 and Glock 19. A.M. also stated that MIXON is dangerous and she is afraid of him.

21.     A.M. stated that she and MIXON started talking to each other in March of 2018 after seven years of not talking to each other. They began to spend time together and this led to the two trying to make it work and get back together. A.M. is aware that MIXON has a domestic violence background including battery and believes one felony. She knew that MIXON cannot possess a firearm. When A.M. and MIXON started to get back together, she stated that MIXON "started nice." She stated that MIXON kept asking her if she had ever been in any trouble with the police, and she told him she hadn't. MIXON began asking her to buy a firearm for him to which A.M. stated she initially told him no. A.M. stated that he kept pressuring her to purchase him a firearm and then got "real aggressive."

22.     For the Glock 30 purchase, A.M. stated that MIXON told her, "I'm taking you, you going to Fleet Farm," and drove her in her vehicle to the store in Germantown. Once

5

they arrived at Fleet Farm, MIXON explained what type of firearm he wanted her to purchase for him and showed A.M. photos of the type of Glock 30 on his phone. MIXON told A.M. that he could not go in the store with her because he was a felon and handed her cash to purchase the firearm. A.M. entered the store and asked the sales clerk to look at "Glocks." She then picked out the Glock 30 that matched what MIXON directed her to buy for him. A.M. stated it took about an hour to complete the transaction. MIXON stayed in her vehicle the entire time. Once A.M. had successfully purchased the firearm and exited the store, MIXON told A.M. to place the firearm in the trunk of her car. The two then drove back to MIXON's residence on 49th and Hadley and MIXON took the firearm out of the trunk and brought it to his apartment. MIXON kept the firearm, the firearm box, and the paperwork.

23. A.M. stated that the second firearm purchase, the Glock 19, occurred in a very similar manner. MIXON drove her in her car to the same Fleet Farm, showed her photos of which firearm to purchase and handed her cash while he stayed in her vehicle. A.M. entered the store and purchased the exact firearm MIXON had told her to purchase. She stated that the second time, the process went much faster because she had already purchased a firearm from the store. A.M. exited the store, MIXON opened the trunk and directed her to place the firearm in the trunk of her vehicle, and the two drove back to MIXON's residence. Again, MIXON kept the firearm, the firearm box, and all the paperwork. A.M. stated that if someone were to look through MIXON's cell phone, they would find numerous photos of him with the Glock 30 and Glock 19 along with another black firearm. A.M. stated that she has looked through his phone and has seen them.

24.     A.M. stated that once back at MIXON's residence, from the above purchase of the Glock 19, MIXON took the firearm out of the box and put a clip in the firearm. A.M. informed agents that MIXON told her that he already had .45-caliber ammunition to go with the Glock 30, but had to get 9mm ammunition to go with the Glock 19.

25.     MIXON then proceeded to call several people in her presence and asked them if they had any 9mm ammunition. A.M. stated that MIXON left a short time after the calls and was away for approximately 2-3 hours. Once MIXON returned, A.M. noticed that MIXON had an extended magazine clip for the Glock 19 and that it was filled with bullets.

26.     Agents asked A.M. about any incidents that she knew about MIXON firing the firearms. A.M. remembered that on one occasion she was lying on MIXON's couch sometime after she had purchased the two firearms when she overheard him talking to someone on the phone. A.M. heard him mention something about an incident that occurred on the East Side, in which MIXON stated that they were "showing out and had to light that mofo up." I know based on my training and experience that the term "light up" is often used to describe shooting at someone with a firearm.

27.     A.M. stated that MIXON also told her about the day he was arrested for possession of the Glock 30. MIXON told her, in substance, that he was driving and stopped by the "Hot Spot," a liquor store, to get some juice. MIXON stated that he had to use the restroom so he exited the store and urinated in a yard by a white house. MIXON told A.M. that he had the gun with him and that once he saw the cops coming he wiped down the gun and tossed it. MIXON stated that the cops found it in a yard and not on his body, so therefore he was going to beat the case.

28. A.M. informed agents that she retrieved the Glock 19 from MIXON's vehicle on June 29, 2018, not her sister's house. She did not do this at the direction of law enforcement. She informed law enforcement that she retrieved the Glock 19 from the trunk of MIXON's silver Buick, the Target Vehicle.

29. A.M. told agents that she told MIXON that agents had a search warrant for the firearm because she did not want to "get into it" with him after he had told her to call agents and get his other gun back. MIXON told her that she had better "not tell on him" and that he was going "to beat" his current case. MIXON also told A.M. that she was going to purchase another firearm for him and that it would be a Glock 27.

30. During the week of August 20th, 2018, A.M. advised me that MIXON was interested in having her or someone else purchase another firearm for him.

31. On August 28, 2018, while being directed by myself, A.M. placed a recorded phone call to MIXON at phone number 414-795-6500 to inquire about what firearms he was looking at. A.M. asked MIXON what type of firearms he was trying to get because he had been looking at several types. MIXON told A.M. that he was looking at an "XN" and that they only wanted $500 for the 9mm and probably wanted $560-$570 for the 40 caliber, so he expected it to cost about $600 after taxes.

32. A.M. told MIXON that she was not going back to Farm and Fleet because they already purchased a Glock 19 and a Glock 30 from there. MIXON told A.M. that he was thinking of having "Shannon," purchase the firearm for him and that "Shannon" would do it. MIXON stated that he was thinking about Cabela's or a different Farm and Fleet; and that there are plenty of gun shops they could go to.

33.    At my direction, A.M. stated to MIXON that if "Shannon" could not purchase the firearm that she would do it again. The conversation ended with A.M. telling MIXON that he would have to pay her this time if she purchased another firearm for him.

34.    On September 20, 2018, at my direction, A.M. placed a recorded phone call to MIXON at phone number 414-795-6500. A.M. asked, "You know that Farm and Fleet where you had me get those firearms from?" MIXON replied, "Yeah." A.M. then stated that they had called to ask if she wanted to sign up for a gift card. The conversation concluded shortly after that.

35.    On September 24, 2018, I spoke to A.M. regarding the identity of "Shannon" (a female that MIXON indicated to her that he was looking to have purchase him a firearm). A.M. informed me that she only knew "Shannon" as someone who has kid(s) with MIXON. A.M. also informed me that MIXON told her that he had recently asked "Shannon" to purchase a firearm for him and that "Shannon" strongly told him that she would not. It is not known to law enforcement whether MIXON had someone else buy him a firearm. To date, law enforcement does not know the location of this third black firearm, if it was purchased.

36.    On October 2, 2018, TFO Ayala and I interviewed A.R. in regards to a Springfield Armory, Model XDS, .40 caliber pistol bearing serial number S3526463 ("Springfield XDS") she had purchased from the Mills Fleet Farm in Germantown, WI on October 30, 2017. This was the same Mills Fleet Farm MIXON had buy the Glock 19 and the Glock 30.

37.    I asked A.R. what had happened to the Springfield XDS she had purchased in October of 2017. A.R. informed agents that she had gotten into a big fight with her ex-

boyfriend, MIXON, and he had taken the firearm. A.R. further explained that MIXON had made her purchase the firearm for him. A.R. stated that she and MIXON had started dating in the summer of 2017 and she had moved into his apartment on 39th and Hadley sometime in December 2017.

38. I asked A.R. how MIXON talked her into purchasing a firearm for him to which she replied that he had threatened her. A.R. stated that MIXON's pressure to get her to purchase the firearm started slowly in that he was casually bringing the idea up and asking if she had a criminal history. A.R. stated that she initially said no to the purchase of a firearm for him, but MIXON then escalated the pressure by also threatening her. A.R. could not remember what exactly the threats were, but agreed it was understood that if she did not purchase the firearm, MIXON would physically hurt her.

39. A.R. described the day that she went to purchase the firearm for MIXON. A.R. informed me that they were at MIXON's apartment and that he had driven her in the Target Vehicle to Mills Fleet Farm in Germantown. A.R. stated that while MIXON was driving the Target Vehicle, they were arguing the whole time because she did not want to do it. Once they arrived at Mills Fleet Farm, MIXON showed A.R. photos of the firearm on his cell phone and gave her nearly $500. A.R. confirmed that MIXON must have already known how much the firearm would cost with tax because he gave her just under $500. A.R. remembered that it was an XDS, .40-caliber pistol. I asked where MIXON had gotten the money from and A.R. informed me that the money was from selling drugs. A.R. stated that she had witnessed MIXON selling "crack" cocaine on numerous occasions.

40.    A.R. stated that MIXON stayed in the Target Vehicle and before she exited, he told her where to go once she got in the store as she did not know where the firearm section was. Once A.R. arrived at the firearm section, she was looking through the clear glass viewing cases until she identified the Springfield XDS that MIXON had shown her in photos while they were in the Target Vehicle.

41.    Once she identified the Springfield XDS, A.R. informed the worker that she had wanted to purchase that firearm and completed the paperwork.

42.    A.R. stated that MIXON and she returned to Mills Fleet Farm the following day in the Target Vehicle to pick up the Springfield XDS after she had passed the background check. MIXON stayed in the Target Vehicle while A.R. went into the store. A.R. stated that she carried the Springfield XDS in its case from the store to the Target Vehicle where she got into the passenger's seat.

43.    At that point, MIXON took the firearm, opened the case and looked at it. After inspecting it, A.R. stated that MIXON placed it into the trunk of the Target Vehicle. Once it was in the trunk, the two drove to MIXON's apartment where he removed it from the trunk and took it inside his apartment. A.R. stated that she never touched the firearm again once she handed it to MIXON.

44.    A.R. informed me that MIXON kept the firearm under his couch or if he was driving, he kept it in his pocket. A.R. stated that she asked MIXON if she could keep all the paperwork and stated that MIXON would not give it to her.

45.    A.R. informed me that she and MIXON broke up around March of 2018 and that she has not purchased any other firearms for MIXON since the end of their relationship

46.     On October 18, 2018, I conducted a query utilizing ATF's databases and learned that to this date, the Springfield XDS has not been reported as being recovered by law enforcement. It is reasonable to believe that MIXON either still has that firearm or sold it to someone who he knows and could still have access to that firearm. A.M. did inform agents that she believes he sold the firearm to someone because he thought the cops might come after it after his fight with A.R. as the police had been called. MIXON also told her that he disposed of the gun box and A.R.'s paperwork at a gas station off 76th in the City of Milwaukee.

47.     According to A.M., it only took MIXON a couple of hours to obtain the extended magazine and 9mm bullets after MIXON made A.M. purchase the Glock 19 for him. I know from my training and experience that it would be difficult for a prohibited user, such as MIXON, to obtain these items unless he was able to quickly contact people he knew who had easy access to firearms, ammunition, and firearm accessories at their disposal and who would not require any of the needed paperwork.

48.     MIXON has continued to discuss with A.M. the purchase of another firearm, discussed having "Shannon," purchase a firearm for him as well as gun stores he is looking to have a female purchase a firearm for him. He has also discussed models and prices with A.M. specific enough to include tax. According to A.M., MIXON kept her segregated from other females that he has children with or knows. When MIXON is not with A.M., she has no idea who he is with. If MIXON still has possession of the Springfield XDS or has acquired a new firearm, it is reasonable to believe that MIXON would store it in the Target Vehicle and would not tell A.M. about it.

Case 2:18-mj-01325-WED   Filed 11/01/18   Page 13 of 24   Document 1

49.     With all three firearm purchases, MIXON had the firearm placed in the trunk of the vehicle and on June 29th, A.M. retrieved the Glock 19 from the trunk of the Target Vehicle. MIXON later called and told A.M. that he knew that she had taken it. A.M. knows MIXON to keep firearms either under his seat or in the trunk of the TARGET VEHICLE. Prior to July 29th, A.M. informed me that she was upstairs in her residence when she saw MIXON pull into the driveway in the TARGET VEHICLE. A.M. then observed MIXON reach under the driver's seat, retrieve the Glock 19 and place it in the trunk of the TARGET VEHICLE before entering the residence. A.R. informed me that MIXON either kept the Springfield XDS under his couch at his previous residence or in the TARGET VEHICLE with him on his person. She also stated that MIXON was selling narcotics. It is common knowledge amongst law enforcement that narcotic traffickers drive with firearms in their vehicles and/or on their person in order to protect their merchandise and to protect themselves.

50.     A.M. informed me that MIXON's cell phone number was 414-795-6500 and his carrier is Metro PCS. She stated that he had a black ZTE cell phone with a silver rim. She stated that MIXON removed the code because the face of his cell phone is cracked and removing the code was the only way to gain access to it. During the July 9th interview, A.M. stated that if someone were to look through his cell phone, they would find photos of him with the Glock 30 and Glock 19 along with another black firearm. A.M. stated that she had looked through his phone and saw them.

51.     A records query on Target Vehicle was done and showed that the Target Vehicle was registered to Lonnie Mixon Sr. (MIXON's father). I learned that the Target Vehicle is a silver 2006 Buick Lacrosse, bearing license plate number ACB6404.

52.     On October 17, 2018, I conducted surveillance on A.M.'s residence. I arrived at approximately 11am. I observed the Target Vehicle parked in the driveway.

53.     On October 18, 2018, I conducted surveillance at A.M.'s residence. At approximately 6:50am, I observed the Target Vehicle leave A.M.'s residence. I was able to pull up next to the Target Vehicle at a stop light and observed MIXON driving the Target Vehicle.

54.     On October 18, 2018, I reviewed the certified court documents of MIXON and learned the following:

   a.     On or about July 27, 2010, in Milwaukee County Case number 2010CF001949, MIXON was found guilty of under Wisconsin law of misdemeanor battery, 947.01 disorderly conduct and 946.41(1) resisting or obstructing an officer, all misdemeanors in which MIXON was ordered to have no contact with firearms. The battery charge is a crime of domestic violence for purposes of 922(g).

   b.     On or about January 6, 2014, in Milwaukee County Case number 2013CF003407, MIXON was found guilty under Wisconsin law of misdemeanor battery, the intimidation of a victim to dissuade complaints. The court ordered MIXON to have no contact with firearms and was notified, that due to his domestic violence conviction, he was never to possess firearms agent. The battery charge is a crime of domestic violence for purposes of 922(g).

## IV.     Interstate Nexus Report for Each of the Firearms

55.     On October 15, 2018, I reviewed the information on the three firearms and determined the following:

a.      Glock 30: Glock, Model 30GEN4, a firearm bearing serial number BDGH119 was manufactured in Austria.

b.      Glock 19: Glock, Model 19, 9mm a firearm bearing serial number BFAC980 was manufactured in Austria.

c.      Springfield XDS: Springfield Armory, Model XDS, .40 caliber pistol bearing serial number S3526463 was manufactured in Croatia.

56.     Each of the above listed items, a-c, are firearms as defined in 18 U.S.C. § 921(a)(3) and were not manufactured in the State of Wisconsin.

## V.      CONCLUSION

57.     In sum, based upon the facts set forth above, my training, education and experience as an ATF SA, and consultation with other experienced law enforcement officers and agents; I submit there is probable cause for an arrest warrant for MIXON for violation of Title 18 U.S.C. § 922 (g) (9), any individual in possession of a firearm who has been convicted in any court of a misdemeanor crime of domestic violence. As well as I submit there is probable cause for a search warrant for MIXON's DNA and his vehicle, a silver 2006 Buick Lacrosse being WI license plate number ACB6404, and his ZTE cell phone for evidence of Title 18 U.S.C. § 922 (g) (9) and 1512, and Title 21 U.S.C. § 841 and 844.

**ATTACHMENT A**

**PREMISES TO BE SEARCHED**

**[DNA SAMPLE]**

Lonnie R. MIXON Jr., black male, date of birth January 9, 1990, brown eyes, black hair, approximately 5'11'', and approximately 275 pounds.

## ATTACHMENT B

## ITEMS TO BE SEIZED

## [DNA SAMPLE]

Two (2) buccal oral swabs taken from Lonnie R. MIXON Jr. by placing a swab inside his mouth and against the inside of his cheek, thereby extracting saliva and cellular matter.

**ATTACHMENT C**

**PREMISES TO BE SEARCHED**

**[Vehicle 1]**

A silver 2006 Buick Lacrosse, bearing WI license plate number ACB6404 and vehicle ID number 2G4WD582561166363.

## ATTACHMENT D

## ITEMS TO BE SEIZED

### [Target Vechicle]

a.    Electronic Records, Photographs, and Documents and/or items, which reflect the proceeds used for the purchase of or derived from the sale of firearms, including, but not limited to, bank account records, wire transfer records, bank statements and records, money drafts, letters of credit, safety deposit keys and records, money wrappers, money containers, income tax returns, and documentation of financial transfers;

b.    Communication devices, which provide evidence of participation in a conspiracy to distribute firearms, including, but not limited to, telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication device;

c.    Electronic Records, Photographs, and Documents and/or items, which reflect the names, addresses, telephone numbers, communications, and illegal activities of associates in controlled substance trafficking activities, firearm possession or firearm sales, and witness intimidation, including, but not limited to, personal telephone and address books and listings, letters, telephone bills, photographs, audio and video tapes, personal notes and other items;

d.     Records, Photographs and Documents that show indicia of occupancy, residency, control and/or ownership of Vehicle 1 described in this warrant, including, but not limited to, utility bills, telephone bills, cancelled envelopes, and rental documents;

e.     Firearms, including, but not limited to, pistols, revolvers, shotguns, and rifles, and ammunition;

f.     firearms parts, firearms boxes and containers, operational instructions, manuals and parts lists; and

g.     Cleaning kits, holsters, cases or other miscellaneous items used to hold or conceal a pistol, handgun, or rifle; and

h.     Narcotics, and any items associated with the sale or purchase of narcotics.

**ATTACHMENT E**

**ITEM TO BE SEARCHED**

**[Cell Phone]**

MIXON's cell phone described as a ZTE cell phone with a silver rim and the face of his cell phone is cracked. The carrier of the phone is Metro PCS and the number is (414) 795-6500.

## ATTACHMENT F

## ITEMS TO BE SEIZED

## [Cell Phone]

1.    All records on the Device described in Attachment E that relate violations of 18 U.S.C. §§ 922(g)(9), 21 U.S.C. §§ 841 and 842 and 18 U.S.C. § 1512, including:

a.    Texts and voicemail that reveal communication regarding the sale or purchase of narcotics, the possession of a firearm, and the use of a firearm in furtherance of the sale of narcotics, and the intimidation of potential witnesses;

b.    Records or information, photographs, videos, notes, documents, or correspondence, in any format or medium, concerning communications about the sale or purchase of narcotics, the possession of a firearm, and the use of a firearm in furtherance of the sale of narcotics, and the intimidation of potential witnesses.

2.    All names, aliases, and numbers stored in the Device, including numbers associated with the Device, relating to the identities of those engaged in the illegal sale or possession of firearms and/or in the furtherance of sale of narcotics into the United States.

3.    Any and all information, photographs, notes, software, documents, records, or correspondence, in any format and medium, pertaining to sale or purchase of narcotics, the possession of a firearm, and the use of a firearm in furtherance of the sale of narcotics, and the intimidation of potential witnesses.

4.    Any and all address books, names, and lists of names and addresses of individuals who may have been contacted with the Device or by other means for the purpose of committing the

sale or purchase of narcotics, the possession of a firearm, and the use of a firearm in furtherance of the sale of narcotics, and the intimidation of potential witnesses.

5.    The list of all telephone calls, text messages, emails and other electronic records made or received located in the memory of the Device that provides information regarding the identities of and the methods and means of operation and communication by those engaged in the sale or purchase of narcotics, the possession of a firearm, and the use of a firearm in furtherance of the sale of narcotics, and the intimidation of potential witnesses.

6.    Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

7.    GPS, search history and other relevant data that relates to committing the sale or purchase of narcotics, the possession of a firearm, and the use of a firearm in furtherance of the sale of narcotics, and the intimidation of potential witnesses.